# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| Ryan Shane, on behalf of himself and all others similarly situated, | ) ) ) | Case No. 22-cv-03039 |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | **CLASS ACTION COMPLAINT** |
| Bio-Techne Corporation, | ) ) | |
| Defendant. | ) ) | |

Plaintiff Ryan Shane, for his Complaint against Defendant Bio-Techne Corporation on behalf of himself and all others similarly situated, states and alleges as follows:

## INTRODUCTION

1.      This case is the result of Defendant Bio-Techne Corporation's bias and discriminatory beliefs regarding employees, including Plaintiff Ryan Shane, who sought exemptions from COVID-19 vaccination because of their sincere religious beliefs. These employees were not anti-science, nor were they a risk to their coworkers or company customers. Nonetheless, Bio-Techne ignored their legal rights and refused to consider in good faith their requests for religious accommodation.

2.      When Bio-Techne's leaders required employees to be vaccinated against COVID, their statements and actions demonstrated the company would never honestly consider religious accommodations.

3.      Bio-Techne believed that sincere religious beliefs were incompatible with science.

4.      Bio-Techne also wanted to remain popular with its customers.

5.      While COVID caused tragic consequences for many Americans, the virus was enormously profitable for Bio-Techne and many of its customers. Bio-Techne would not allow unvaccinated employees to jeopardize the company's popularity with its customers.

6.      Alternatively, even if Bio-Techne's decisions related to religious accommodations were not so cynical, and its leaders actually believed that Mr. Shane and other unvaccinated people were a threat to others, they were wrong. Unvaccinated individuals did not, and do not pose, a threat to their coworkers, their neighbors, or Bio-Techne's customers.

7.      But facts were not important to Bio-Techne. Sadly, a company that claimed the mantle of "science" refused to consider the evidence that Mr. Shane and others who sought religious exemption or were otherwise unvaccinated were not a danger to others. And if Bio-Techne had simply followed Mr. Shane's suggestion and allow him to work while testing weekly, Mr. Shane would have presented a lower risk of COVID transmission than his vaccinated colleagues.

8.      This action is the necessary consequence of Bio-Techne's own bias and unlawful acts that have caused substantial harm to Mr. Shane and to many others.

## JURISDICTION AND VENUE

9.      The Court has subject matter jurisdiction over this case under: (a) 28 U.S.C. § 1331, as this action arises under the laws of the United states; (b) 28 U.S.C. § 1343(a)(4), as it seeks to recover damages, attorneys fees, and secure equitable relief under Acts of Congress, specifically Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C §§ 2000(e), *et seq.* and the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12101, *et seq*. This Court has original subject matter jurisdiction over this case, as it raises claims pursuant to federal statute, 28 U.S.C § 1331. This Court has supplemental jurisdiction over Mr. Shane's state-law claims pursuant to 29 U.S.C § 1367.

10.     Venue is proper in the United States District Court for the District of Minnesota under 28 U.S.C. § 1391(b), as all or a substantial part of the events giving rise to the claims occurred within the District.

11.     This Court has personal jurisdiction over Bio-Techne as it is incorporated in, and has its principal place of business in, the state of Minnesota.

## DEFENDANT BIO-TECHNE

12.     Defendant Bio-Techne Corporation is a Minnesota corporation with its principal place of business at 614 McKinley Place NE, Minneapolis, Minnesota, 55413. Bio-Techne develops and manufactures materials used in medical and drug research.

## PLAINTIFF RYAN SHANE

13.     Plaintiff Ryan Shane is a former employee of Defendant Bio-Techne. He is currently a resident of Florida. He was required to relocate to find work after Bio-Techne unlawfully terminated his employment.

14.     During his employment with Bio-Techne, Plaintiff's was known as Yan Xing. Mr. Shane's name changed when he became a United States citizen in June 2022.

15.     Mr. Shane was born in the People's Republic of China. He attended Bethune Medical University where he earned his medical degree in 1996.

16.     After briefly practicing internal medicine as a physician in China, Mr. Shane attended Kumamoto University in Japan where he earned a Doctor of Philosophy (Ph.D.) in immunology in 2005.

17.     After earning his Ph.D. in immunology, Mr. Shane was awarded a fellowship from the Japan Society for the Promotion of Science and performed postdoctoral research at Kumamoto University.

18.     In 2008, Mr. Shane moved to Minnesota to perform research in the fields of molecular and cellular biology, microbiology, virology, and immunology at the University of Minnesota.

19.     While working for the University of Minnesota, Mr. Shane and his wife learned about Jesus Christ and Christianity. After studying the faith, they became believers. They committed their lives to following Christ and the teachings of Christianity in every aspect of their lives.

20.     In June 2021, Mr. Shane accepted employment with Bio-Techne as a Virologist Lead Scientist and in July he began working for Bio-Techne at the company's Northeast Minneapolis facility.

## BIO-TECHNE AND COVID

21.    COVID was a boon for Bio-Techne's business. Bio-Techne and many of its customers reaped substantial profits from the virus, including profits related to the research, production, and sale of COVID vaccines.

22.    In August 2021, Bio-Techne's CEO and President Charles R. Kummeth, informed investors that "COVID was an estimated 3% tailwind to our business in Q4 and approximately 4% tailwind for the year . . . . We expect the COVID research and diagnostics will be around for many years . . . making this tailwind a sustainable new layer of our product portfolio going forward."

23.    Bio-Techne's profits were directly or indirectly connected to vaccine and booster sales. These profits impacted company leaders' views of, and employment policies and practices directed at, those who had not purchased and received a COVID vaccine.

24.    Senior Bio-Techne leaders expressed disdain for unvaccinated employees. For example, in September 2021, the company's Chief Human Resources officer stated, "We want every employee to be vaccinated. We are a science company, and we believe in the science."

25.    In September 2021, Bio-Techne announced that it would discriminate between employees who had been vaccinated for COVID and those who had not, regardless of the reason or the employee's motivation for not being vaccinated. Its announcement stated:

At this time, if an employee misses work due to awaiting test results or having tested positive for Covid-19, the following policies are in place:

- o  Vaccinated: Bio-Techne will continue to cover wages of vaccinated employees during their quarantine period.

- o  Unvaccinated: Bio-Techne does not cover wages of unvaccinated employees during their quarantine period (depending on local laws).

26.    On October 5, 2021, Bio-Techne announced that all U.S. employees who work at its offices or facilities (that is, not from home) were required to be vaccinated against COVID by November 1, 2021.

27.    Bio-Techne did not, however, require employees outside the United States to be vaccinated.

## BIO-TECHNE'S ANTI-RELIGIOUS BIAS AND REFUSAL TO HONESTLY CONSIDER REQUESTS FOR RELIGIOUS ACCOMMODATION

28.    Bio-Techne's vaccine mandate announcement stated, "If you believe you have a legitimate reason for a legally permitted exemption from this vaccine requirement, please contact your local Human Resources representative as soon as possible."

29.    In connection with its new policy, Bio-Techne created a new process and forms for employees seeking religious accommodations related to exemption from COVID vaccination. This process was designed to deter employees from seeking religious accommodations.

30.    Bio-Techne created a new "COVID Vaccination Religious Exemption Request Form." The form stated:

When requested, Bio-Techne will provide an exemption/reasonable accommodation for employees' religious beliefs and

practices which prohibit the employee from receiving a COVID vaccine, provided the requested accommodation is reasonable and does not create an undue hardship for the Company or pose a direct threat to the health and/or safety of others in the workplace and/or to the requesting employee.

31.     Bio-Techne required employees to identify their "sincerely held religious belief, practice, or observance that is the basis for your exemption request" and mandated that employees connect their belief to a specific "religion and/or denomination."

32.     Bio-Techne also attempted to interrogate employees or test whether employees' religious beliefs had been applied consistently. It required employees to disclose whether they had received other vaccinations and, if the employee had, required an explanation as to "how your religious belief, practice, or observance conflicts with Bio-Techne's vaccination requirement when you have received other vaccinations."

33.     Bio-Techne informed employees that it "may need to discuss the nature of your religious belief, practice, and exemption request with your religion's spiritual leader (if applicable) or religious scholars to address your request for an exemption."

34.     The form also required employees to "provide documentation to support your request for an exemption" upon request or "explain why" they could or would not.

35.     In fact, Bio-Techne did not seriously consider employees' requests for religious accommodation.

36.     Bio-Techne did not consider requests for accommodation in good faith. It did not actually consider an employee's specific job duties or alternative arrangements or accommodations that would have made unvaccinated employees less likely to spread COVID to others than employees who were vaccinated.

37.    Instead, Bio-Techne questioned and scrutinized employees regarding their beliefs, seeking to find inconsistency and to intimidate employees into accepting vaccination contrary to their beliefs.

38.    Bio-Techne's leadership and its customers simply did not want unvaccinated employees to be present at their facilities.

39.    When employees with religious objections to COVID vaccines suggested alternative ways that they could ensure workplace safety, Bio-Techne simply ignored their proposals and fired them.

40.    Bio-Techne had pre-determined that it would not provide religious accommodations for employees who worked at any of their sites.

41.    Bio-Techne has applied these same assumptions, policies, and practices to refuse to accommodate the religious beliefs of unvaccinated job applicants who would work at a Bio-Techne facility in the United States.

## MR. SHANE AND UNVACCINATED EMPLOYEES WERE NOT A GENUINE THREAT TO OTHERS

42.    Bio-Techne has asserted that allowing Mr. Shane or any other unvaccinated employee to work at one of its (U.S.) facilities would have created an unreasonable level of safety risk to co-workers, customers, and other third parties. If this assertion was genuine, it was genuinely wrong.

43.    Bio-Techne, at times, suggested that government mandates required it to mandate vaccination without exception. However, contrary to the company's position, all potentially applicable government regulations related to employee vaccination explicitly

recognized that accommodations exempting employees from vaccination were allowed and were required by an applicable law.

44.     For a period of time, it was believed that Bio-Techne would be required to follow the Occupational Safety and Health Administration's ("OSHA") Emergency Temporary Standard on COVID-19 Vaccination and Testing published on November 5, 2021. See 86 Fed. Reg. 61402 (2021) ("ETS"). But the ETS never required or even allowed Bio-Techne's draconian approach to religious accommodations, for multiple reasons.

45.     Ultimately, the U.S. Supreme Court held that OSHA lacked authority to issue the ETS. But even before the Court's decision, the ETS never actually mandated vaccination—instead it expressly authorized weekly *testing* as a safe alternative to vaccination. And regardless of an employer's policy, the ETS explicitly confirmed that employers must exempt employees from vaccination by providing "reasonable accommodation[s] under federal civil rights laws [if employees] have . . . sincerely held religious beliefs, practices, or observances that conflict with the vaccination requirement."

46.     Bio-Techne has cited President Biden's Executive Order ("EO") 14042 as justification for its refusal to grant religious accommodations. As an initial matter, it does not appear that Bio-Techne was actually a federal service contractor covered by EO 14042.

47.     Of course, even if Bio-Techne had been covered, EO 14042's text and binding guidance on the order's implementation and interpretation issued by the Biden Administration in conjunction with the order, explicitly informed covered contractors that religious and disability accommodations authorized by Title VII and the ADA superseded the order's vaccination and even masking requirements.

48.    In sum, nothing in federal or state law or regulation required or authorized Bio-Techne to refuse to accommodate or fire Mr. Shane, or any other employee.

## BIO-TECHNE WAS AWARE THAT VACCINATION DID NOT PREVENT TRANSMISSION OF COVID

49.    By October 2021, Bio-Techne knew that the vaccine did not prevent the spread of COVID or, at a minimum, that any difference in the risk of transmission of COVID by vaccinated individuals compared to unvaccinated individuals was uncertain at best.

50.    Bio-Techne knew by the summer of 2021 that both vaccinated and unvaccinated individuals could be infected with COVID and both had similar COVID viral loads, a key measure of potential transmissibility.

51.    The "secondary attack rate" of COVID is the rate of transmission of the virus between an infected individual and her or his contacts (such as coworkers). A study published in the *Lancet* and publicized by the U.S. Centers for Disease Control and Prevention ("CDC") in October 2021 demonstrated that the secondary attack rate for vaccinated individuals was similar as the rate for unvaccinated (25% vs 23%), but *unvaccinated* individuals were slightly *less likely* to spread COVID to close contacts than individuals who had been vaccinated.

52.    This should not have been a surprise to Bio-Techne, a science company because no COVID vaccine was approved to prevent transmission of COVID.

53.    On February 4, 2020, "[t]he HHS Secretary declared that circumstances exist justifying the authorization of emergency use of drugs and biological products during the

COVID-19 pandemic, pursuant to section 564 of the FD&C Act, effective March 27, 2020." https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-use-authorization#vaccines. Thereafter, beginning in December 2020, pursuant to this declaration, the FDA issued an emergency use authorization for several vaccines and boosters. The FDA later issued a non-emergency authorization of a vaccine for COVID-19.

54.    To date, no COVID-19 vaccine has been approved to prevent the transmission of COVID-19 from an infected individual to another individual. In fact, the CEO of Pfizer at the time Pfizer was authorized to sell its product for the above use, stated that it was "still unknown whether people who've been vaccinated could still be carriers of the virus, able to transmit it to others" and that he thought the ability of the vaccine to prevent transmission was "something that needs to be examined" and that he was "not certain about [whether the vaccine could prevent transmission] right now." https://www.nbcnews.com/news/us-news/3-vaccine-executives-say-after-approval-distribution-will-be-main-n1249928.

55.    All COVID-19 vaccine manufacturers have received multiple updates to their authorizations to use, primarily to expand the ages indicated as well as add the use as a booster. To date, none of these manufacturers have added an indication or use for a COVID vaccine related to stopping, slowing, or otherwise impacting the transmission of COVID-19 from an infected individual.

56.    Stated otherwise, no approved COVID-19 vaccine has, at any time, been approved for the purpose of affecting transmission of COVID-19. None of the vaccine

manufacturers has ever made an official claim that their vaccines could affect the transmission of COVID-19 because doing so would be unlawful. Thus, Bio-Techne was conditioning employment on an off label, unapproved use of a vaccine.

57.    In addition, CDC and scientific journals have published data showing that any initial effectiveness of COVID vaccines wanes substantially over time. Data confirms that vaccines and boosters are not effective against successive COVID variants.

58.    Regardless of the precise difference in potential transmission or risk of transmission between unvaccinated individuals and vaccinated individuals, Bio-Techne knew—or could have known if it cared to look—that unvaccinated individuals could perform regular self-testing (such as weekly or every few days) at their own expense. Both self-tests and laboratory testing have been available in Minnesota and other states, free of charge, including in the fall of 2021.

59.    If unvaccinated individuals engaged in regular testing, along with other common sense precautions, their likelihood of transmission would be *lower* than vaccinated individuals.

60.    In the fall of 2021, the CDC's website explained that self-testing can be used to detect COVID and prevent transmission "by anyone who is symptomatic regardless of their vaccination status" and that "Unvaccinated people without COVID-19 symptoms can also use self-tests, especially if they were potentially exposed to someone with COVID-19."

61.    The CDC specifically endorsed "serial testing" as a means to prevent the spread of COVID. The CDC explained that:

Serial testing is when a person tests themselves multiple times for COVID-19 on a routine basis, such as every few days. By testing more frequently, you might detect COVID-19 more quickly and could reduce the spread of infection. Some self-administered tests come with more than one test and instructions for performing serial testing.

62.     None of this obvious evidence mattered to Bio-Techne. It did not matter that self or laboratory tests were free to unvaccinated employees who could engage in serial testing on a regular basis to ensure they did not attend work with COVID.

63.     And, for those vaccinated employees who Bio-Techne claimed could safely work in-person with others—but who had the same or similar COVID viral loads and secondary attack/transmission rates—Bio-Techne did not require testing or similar preventive measures that were readily available.

64.     Bio-Techne's belief or purported belief that unvaccinated employees were impaired and unsafe to work in-person with others was false

65.     Many reasonable options existed that would have allowed unvaccinated employees to work at Bio-Techne facilities without presenting any greater risk of COVID transmission than vaccinated individuals would.

66.     One such option was to require unvaccinated employees to present a negative COVID test on a weekly basis in order to be allowed onto Bio-Techne premises. If Bio-Techne had adopted this measure, unvaccinated employees would have been significantly less likely to spread COVID than their vaccinated colleagues.

67.    Nevertheless, Bio-Techne fired, disciplined, refused to hire, or otherwise acted adversely to its unvaccinated employees, based on its perception that they were impaired in their ability to meet or interact with others in person.

### ALLEGATIONS SPECIFIC TO PLAINTIFF RYAN SHANE

68.    Mr. Shane was not vaccinated when he was hired by Bio-Techne.

69.    At work, Mr. Shane rarely interacted with others. He worked in his office alone or in a lab, also often alone. His limited interactions with others occurred primarily by email or telephone.

70.    Mr. Shane's only regular contact with another Bio-Techne employee was a weekly 30-minute meeting with his manager. This meeting had been held virtually through Microsoft Teams. When the meeting was in-person, Mr. Shane and his manager could, and when required did, wear masks while maintaining required social distancing.

71.    Mr. Shane's job did not involve working with Bio-Techne customers or vendors.

72.    Mr. Shane performed his job well at Bio-Techne. During his employment with the company, Bio-Techne never disciplined or reprimanded Mr. Shane, nor did it inform him of problems with his performance.

### Mr. Shane's Request for Religious Accommodation

73.    After Bio-Techne announced its COVID vaccine mandate, Mr. Shane emailed Bio-Techne's Human Resources staff. He informed the company that he was applying for a religious exemption from COVID Vaccination and asked what criteria the

company would use to evaluate his request. He also asked if there was any reason his religious exemption request would be denied.

74.    A Bio-Techne Human Resources staff member responded, stating that a committee with "members from Legal and HR" was "just beginning to gather and understand the basis on which employees are applying" but Bio-Techne had no "list of what qualifies as an exemption."

75.    This message attached a copy of Bio-Techne's COVID Vaccination Religious Exemption Request Form and informed Mr. Shane, "We are encouraging employees to complete the form honestly with their sincerely held religious belief/practice so the committee can begin to research those values."

76.    Mr. Shane completed Bio-Techne's form as instructed, informing the company of his sincere religious beliefs that prevent him from being vaccinated for COVID. He submitted the form to human resources as instructed on October 15, 2021.

77.    As required by Bio-Techne, Mr. Shane's request for accommodation included a completed Bio-Techne COVID Vaccination Religious Exemption Request Form, a personal statement, a letter from pastor Steven Lee, and a notarized Affidavit.

78.    On October 22, 2021, Bio-Techne's human resources department sent Mr. Shane a questionnaire, asking about several matters including his duties, workspace, and proposed accommodations.

79.    Three days later, on October 25, Mr. Shane responded, explaining that:

> I work in my office (Room B1-101), and sometimes in the lab
> (Room B1-502) with hardly anybody around. Regarding being
> in physical proximity with other employees, I only regularly

> meet with my manager Aaron Boeckermann once a week,
> around 30 minutes, both of us wearing masks and keeping
> social distance. Sometimes the meetings were conducted
> virtually through the Microsoft Team[s].

80. Mr. Shane further explained that he had natural immunity as a result of previously contracting and recovering from COVID—which, research has shown, protected him more effectively against the Delta variant than a vaccine would.

81. Mr. Shane proposed that, to accommodate his religious beliefs, Bio-Techne could require him to wear a mask and gloves, keep social distance, wash his hands frequently, and clean and disinfect shared instruments and workspaces.

82. Mr. Shane informed Bio-Techne that he was willing to undergo regular testing (such as weekly testing) for COVID, at his own expense.

83. Bio-Techne has not required employees who are vaccinated against COVID to undergo regular testing for COVID.

**Bio-Techne Refuses to Discuss Available Accommodations**

84. On November 3, 2021, a member of Bio-Techne's Human Resources department interviewed Mr. Shane regarding his exemption request. The sole focus of this interview, however, was to attempt to find inconsistencies in Mr. Shane's religious beliefs.

85. Bio-Techne's human resources representative asked Mr. Shane questions unrelated to his accommodation request, such as whether Mr. Shane's faith prevents him from using or consuming certain medicines, foods, or alcohol.

86.    Bio-Techne's human resources representative informed Mr. Shane that the company could not grant religious accommodations because of pressure from or requirements of company customers who develop COVD-19 vaccines.

87.    Based on his request for accommodation exempting him from COVID vaccination, Bio-Techne assumed that Mr. Shane's religious beliefs would prevent him from performing his job. This had never been an issue before Mr. Shane requested a religious accommodation.

88.    Based on his request for accommodation exempting him from COVID vaccination, Bio-Techne assumed that Mr. Shane's religious beliefs would prevent him from working on vaccine research and development, editing of the human genetic code, and development of medicines, or would conflict with the fact that Bio-Techne sold products to customers who developed COVID vaccines and treatments.

89.    Bio-Techne had no basis for its concerns other than Mr. Shane's professed religious beliefs. Mr. Shane had not refused to perform any job duty, nor had he refused to work for any customer during his employment with Bio-Techne.

90.    Bio-Techne never genuinely considered Mr. Shane's request for accommodation. The company never considered the numerous potential reasonable accommodations available that would have allowed Mr. Shane to continue to safely work at Bio-Techne.

91.    After Mr. Shane submitted his request for accommodation, Bio-Techne never discussed reasonable accommodations proposed by Mr. Shane, his job duties, any spaces

where worked, or any alternatives to vaccination that would have allowed Mr. Shane to safely work while accommodating his religious beliefs.

92.    Bio-Techne never actually considered or discussed with Mr. Shane any of the following in connection with his exemption request:

   a.  Non-vaccine COVID mitigation measures that Bio-Techne was using in Mr. Shane's business unit;

   b.  Transmission rates in Mr. Shane's business unit or Bio-Techne overall;

   c.  Whether Mr. Shane would or could avoid common spaces at Bio-Techne facilities;

   d.  How frequently Mr. Shane would or could be tested for COVID, including at his own expense; or

   e.  Indicia of Mr. Shane's natural immunity to COVID, such as antibody levels.

93.    Bio-Techne never intended to grant Mr. Shane's requested accommodation.

**Bio-Techne Fires Mr. Shane**

94.    On November 12, 2021, Bio-Techne informed Mr. Shane, "We have concluded you have demonstrated that your religious beliefs are sincerely held and preclude you from taking the vaccine."

95.    Nonetheless, Bio-Techne falsely claimed:

> there is no sufficiently safe and acceptable accommodation or alternative based on your position, duties, and necessary exposure to other employees. . . . .[A]llowing you to continue your job responsibilities while remaining unvaccinated would impose an undue hardship on the Company, would impose extra administrative burdens and costs on the Company, and would create an unreasonable level of safety risk to co-workers and third parties with whom you would need to interact and have prolonged contact.

96.    Bio-Techne also falsely informed Mr. Shane that:

at the present time and based on CDC guidance and prevailing science, there are no accommodations that can make interactions with customers or other employees equally as safe as being fully vaccinated. Accordingly, the Company determined it could not grant your exemption request because your role requires you to have significant interaction with and exposure to other employees, work in shared workspaces with other employees, and attend in-person meetings and presentations.

97.    On November 19, Mr. Shane replied, stating that "I am not aware of any hardship, burden or additional costs the company would experience if [it] allowed me to keep my job," and that "I … do not understand why the company has not been willing to consider any potential alternatives."

98.    On November 21, Bio-Techne responded to Mr. Shane. For the first time— more than a week and a half after Bio-Techne told Mr. Shane it was firing him—Bio-Techne told him that "we appreciate your suggestions" for accommodations, but that it could not do things like:

- "Rearrange the lab and other work environments to ensure no other employees share enclosed work space with you;

- Incur additional costs as required by law for additional PPE and routine/weekly testing;

- Ensure you have no connection to any work done to support federal contracts or subcontracts (or customer contracts) which would require you to be vaccinated and alter our teams based on your vaccination status;

- Alter staffing arrangements to limit your in-person and/or in-lab physical presence; and

- Actively manage you and others to ensure these restrictions are being followed."

99.    Bio-Techne did not explain why it could not simply allow Mr. Shane to submit weekly COVID testing without using company time or resources on top of the other precautions he was already taking.

100.    Bio-Techne did not require vaccinated employees to regularly test for COVID.

101.    Bio-Techne gave no sign that it had given any honest or good-faith consideration to Mr. Shane's proposed accommodations or to the specific circumstances and characteristics of his duties and work location.

102.    Bio-Techne discriminated against Mr. Shane and others based on customer preferences or the customer preference Bio-Techne perceived.

103.    Bio-Techne discriminated against Mr. Shane and others by refusing to grant their requested religious accommodations.

104.    Such accommodations would not have caused any undue hardship and could have been free of charge to Bio-Techne. Instead, by terminating Mr. Shane and other skilled religious employees, Bio-Techne intentionally created any hardship by creating a job opening that was difficult or impossible to fill.

## **CLASS ALLEGATIONS**

105.    Mr. Shane seeks to represent and have certified two classes:

### *The Religious Discrimination Class*

106.    The Religious Discrimination Class consists of all individuals who, between October 5, 2021 and the entry of judgment in the case:

(1) Were employed by or applied for a position at Bio-Techne;

(2) Requested that Bio-Techne accommodate their religious beliefs by exempting them from receiving a COVID vaccine;

(3) After requesting the exemption, either:

    a. were fired, suspended, disciplined, or subjected to any adverse employment action by Bio-Techne as a result of not receiving a COVID vaccine, or

    b. were not hired by Bio-Techne to a position for which they applied.

107.    Mr. Shane cannot determine the exact number of members in the Religious Discrimination Class, since doing so would require access to Bio-Techne's records of class members' exemption requests. However, on information and belief, Mr. Shane estimates that the class consists of at least many dozens of individuals, rendering it so numerous that joinder of all member is impracticable.

108.    There are significant questions of law and fact common to the class, including:

- Whether Bio-Techne adopted a policy and practice of uniformly rejecting religious-exemption requests from its COVID mandate, without any individualized good-faith consideration of the employee's proposed accommodations;

- Whether the company discriminated against class members on the basis of their religion, in violation of Title VII and Minnesota law;

- Whether an unvaccinated employee who engages in weekly testing and other basic precautions is less likely to transmit COVID in the workplace than the same employee who receives the vaccine but conducts no testing; and

- Whether Bio-Techne's failure to offer weekly testing as a reasonable accommodation was religious discrimination in violation of Title VII and Minnesota law.

109.    Mr. Shane's claims are typical of the claims of the other class members. Like the rest of the class, Mr. Shane requested a religious exemption from Bio-Techne's COVID

vaccine mandate, and Bio-Techne denied his request and fired him without any serious consideration of his proposed accommodations. Mr. Shane has no conflicts of interest with the class.

110.    Bio-Techne has acted on grounds that apply generally to the class because, as against each class member, it has taken adverse employment actions without engaging in the legally required interactive process or otherwise giving good-faith consideration to the class member's request for a religious accommodation. As a result, final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

111.    Questions of law or fact common to class members predominate over any questions affecting only class members. Because Bio-Techne uniformly denied requests for religious accommodations without considering the employee's individual proposed accommodations, the lawfulness of its process can be determined in common for the entire class. In addition, a large portion of the damages due to class members consists of back pay or other lost wages, which can be calculated mechanically based on records maintained by Bio-Techne.

112.    A class action is superior to other available methods for fairly and efficiently adjudicating the claims of class members. Bio-Techne discriminated against all class members in exactly the same way, and through the application of a uniform policy. Therefore, individual litigation of class members' claims would involve repeated re-litigation of exactly the same questions.

### *The Perceived Disability Class*

113.    The perceived disability class consists of all individuals who, between

October 5, 2021 and the entry of judgment in the case:

- Were employed by or applied for a position at Bio-Techne; and

- Were not granted an exemption from Bio-Techne's COVID vaccine policy; and

- Were fired, not hired, suspended, disciplined, or subjected to any adverse employment action by Bio-Techne as a result of not receiving a COVID vaccines.

114.    Mr. Shane cannot determine the exact number of members in the Perceived

Disability Class, since doing so would require access to Bio-Techne's records. However,

on information and belief, Mr. Shane estimates that the class consists of many dozens of

individuals, rendering it so numerous that joinder of all member is impracticable.

115.    There are significant questions of law and fact common to the class,

including:

- Whether Bio-Techne acted adversely to unvaccinated individuals because it perceived the condition of their immune system as impairing their ability to meet or interact in person with other people;

- Whether an unvaccinated employee who engages in weekly testing and other basic precautions is less likely to transmit COVID in the workplace than the same employee who receives the vaccine but conducts no testing; and

- Whether Bio-Techne's adverse actions toward class members violated the Americans with Disabilities Act.

116.    Mr. Shane's claims are typical of the class of the other class members. Like

the rest of the class, Mr. Shane was fired by Bio-Techne because Bio-Techne perceived

him as impaired in his ability to meet with other people. Mr. Shane has no conflicts of interest with the class.

117.   Bio-Techne has acted on grounds that apply generally to the class because it took adverse action against each class member based on Bio-Techne's false belief that the class member was impaired in his or her ability to meet or interact in person with others. As a result, final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

118.   Questions of law or fact common to class members predominate over any questions affecting only individual class members. Because Bio-Techne uniformly perceived all class members as impaired and acted adversely toward all of them for that reason, their claims can be decided with little or no examination of their individual circumstances. In addition, a large portion of the damages due to class members consists of back pay or other lost wages, which can be calculated mechanically based on records maintained by Bio-Techne.

119.   A class action is superior to other available methods for fairly and efficiently adjudicating the claims of class members. Bio-Techne discriminated against all class members in exactly the same way, and through the application of a uniform policy. Therefore, individual litigation of class members' claims would involve repeated re-litigation of exactly the same questions.

## COUNT I
### Religious Discrimination, Failure to Interact, and Failure to Accommodate Religious Beliefs, Practices, or Observances in Violation of Title VII of the Civil Rights Act of 1964
### (By Mr. Shane and the Religious Discrimination Class)

120.    Mr. Shane and the Religious Discrimination Class re-allege each of the foregoing paragraphs.

121.    Bio-Techne is an "employer" within the meaning of 42 U.S.C § 2000e(b).

122.    Mr. Shane and each member of the Religious Discrimination Class was an "employee" within the meaning of 42 U.S.C § 2000e(f).

123.    Title VII prohibits discrimination on the basis of religion, *id*. § 2000e-2, and requires employers to reasonably accommodate their employees' sincerely held religious beliefs. *Id*. § 2000e(j).

124.    Mr. Shane and members of the Religious Discrimination Class were employees of Bio-Techne who held sincere religious beliefs that prevented them from receiving any COVID vaccine.

125.    Mr. Shane and each member of the Religious Discrimination Class informed Bio-Techne of the conflict between his or her religious beliefs and the company's vaccine mandate.

126.    Guidance issued by the EEOC and decisions of the federal courts require that requests for reasonable accommodation be considered based on their individual, particularized circumstances, and that any claim of undue hardship by the employer be assessed on a case-by-case basis rather than through a rote or blanket application of company policy, including vaccine mandates.

127.    When an employee requests an accommodation, Title VII requires that employers to such claims in good faith and/or engage in a good faith interactive process whereby the employer and employee work together, exchanging information, with the goal of identifying an effective and reasonable accommodation.

128.    Bio-Techne violated Title VII by discriminating against Mr. Shane and members of the Religious Discrimination Class on the basis of religion, including through its policies and practices that discriminated against these employees who sought or attempted to seek religious accommodations exempting them from Bio-Techne's COVID vaccine mandate.

129.    Bio-Techne violated Title VII by its failure to interact, failure to consider accommodations, and failure to engage in a good-faith effort to determine if a reasonable accommodation was available that could eliminate the conflict between Bio-Techne's COVID vaccine mandate and Mr. Shane's and members of the Religious Discrimination Class's religious beliefs, practices, or observances.

130.    Bio-Techne discriminated against Mr. Shane and members of the Religious Discrimination Class in violation of Title VII by taking adverse employment action against them because Bio-Techne believed that individuals who requested religious accommodations exempting them from COVID vaccination did not believe in science or scientific principles, could not honestly perform work for some or all of Bio-Techne's customers, or refused to work with vaccine manufactures solely because of the employees religious belief or request for religious accommodation.

131.    Bio-Techne also violated Title VII by its failure to reasonably accommodate Mr. Shane's and members of the Religious Discrimination Class's sincerely held religious beliefs, practices, or observances that conflicted with Bio-Techne's COVID vaccine mandate and that would not have created an undue hardship as defined in Title VII.

132.    Bio-Techne engaged in religious discrimination and adverse employment actions against Mr. Shane and each member of the Religious Discrimination Class, without justification, at the explicit request of Bio-Techne's customers or based Bio-Techne's desire to please its customers that were biased against Mr. Shane and members of the Religious Discrimination Class because of their religious beliefs.

133.    Bio-Techne engaged in religious discrimination against Mr. Shane and each member of the Religious Discrimination Class by designing unlawful policies and practices that were designed to intimidate and to deter employees from seeking religious accommodations related to COVID vaccination.

134.    Mr. Shane and members of the Religious Discrimination Class proposed accommodations that included measures that Bio-Techne knew were effective and useful in other circumstances—such as social distancing, testing, and mask wearing.

135.    No matter what accommodations a class member proposed, Bio-Techne did not respond and did not consider the proposal in an individualized way, but instead applied a one-size-fits-all rule rejecting exemption requests.

136.    Available reasonable accommodations would have allowed unvaccinated individuals, including Mr. Shane and each member of the Religious Discrimination Class, to safely work for Bio-Techne without any undue hardship to Bio-Techne's business.

137.    The only hardship to Bio-Techne's business related to Mr. Shane's or other members of the Religious Discrimination Class's unvaccinated status was self-inflicted and irrational choice by Bio-Techne to terminate the employee without cause. In so doing, Bio-Techne created a job opening that it knew would be difficult or in some cases, impossible, to fill.

138.    As a result, Bio-Techne fired, refused to hire, or otherwise took adverse employment action against each member of the Religious Discrimination Class.

139.    Had Bio-Techne interacted with Mr. Shane and the other Class members in good faith about their requests, it would quickly have realized that reasonable measures were available to accommodate class members' religious beliefs while imposing no burden or a *de minimis* burden on Bio-Techne.

140.    Specifically, Bio-Techne would have realized that employees could take a weekly COVID test, at their own expense, and maintain other basic mitigation practices— and as a result would pose less transmission risk than vaccinated Bio-Techne employees who were not engaged in weekly testing.

141.    Bio-Techne failed to offer this reasonable accommodation to any class member, instead firing or refusing to hire each of them. Bio-Techne's actions constitute discrimination on the basis of religion and failure to accommodate, all in violation of 42 U.S.C §§ 2000(e)-2 and 2000(e)(j).

142.    Bio-Techne's actions constitute discrimination on the basis of religion and failure to accommodate, all in violation of 42 U.S.C §§ 2000(e)-2 and 2000(e)(j).

143.    Because of Bio-Techne's unlawful actions, Mr. Shane and each Class member have suffered and continue to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorneys' fees in excess of $50,000.

## COUNT II
**Religious Discrimination, Failure to Interact, and**
**Failure to Accommodate Religious Beliefs, Practices, or Observances**
**in Violation of the Minnesota Human Rights Act**
**(By the Religious Discrimination Class)**

144.    Mr. Shane and the Religious Discrimination Class re-allege each of the foregoing paragraphs.

145.    Bio-Techne is an "employer" within the meaning of Minn. Stat. § 363A.03, subd. 16.

146.    Mr. Shane and each member of the Religious Discrimination Class was an "employee" within the meaning of Minn. Stat. § 363A.03, subd. 15.

147.    The Minnesota Human Rights Act, Minn. Stat. § 363A.01 *et seq.* (the "MHRA") prohibits discrimination on the basis of religion and requires employers to reasonably accommodate their employees' sincerely held religious beliefs.

148.    Mr. Shane and members of the Religious Discrimination Class were employees of Bio-Techne who held sincere religious beliefs that prevented them from receiving any COVID vaccine.

149.    Mr. Shane and each member of the Religious Discrimination Class informed Bio-Techne of the conflict between his or her religious beliefs and the company's vaccine mandate.

150.    The MHRA requires that requests for reasonable accommodation be considered based on their individual, particularized circumstances, and that any claim of undue hardship by the employer be assessed on a case-by-case basis rather than through a rote or blanket application of company policy, including vaccine mandates.

151.    When an employee requests an accommodation, MHRA the requires that employers to such claims in good faith and/or engage in a good faith interactive process whereby the employer and employee work together, exchanging information, with the goal of identifying an effective and reasonable accommodation.

152.    Bio-Techne discriminated against Mr. Shane and members of the Religious Discrimination Class in violation of the MHRA by taking adverse employment action against them because Bio-Techne believed that individuals who requested religious accommodations exempting them from COVID vaccination did not believe in science or scientific principles, could not honestly perform work for some or all of Bio-Techne's customers, or refused to work with vaccine manufactures solely because of the employees religious belief or request for religious accommodation.

153.    Bio-Techne violated the MHRA by discriminating against Mr. Shane and members of the Religious Discrimination Class on the basis of religion, including through its policies and practices that discriminated against these employees who sought or attempted to seek religious accommodations exempting them from Bio-Techne's COVID vaccine mandate.

154.    Bio-Techne violated the MHRA by its failure to interact, failure to consider accommodations, and failure to engage in a good-faith effort to determine if a reasonable

accommodation was available that could eliminate the conflict between Bio-Techne's COVID vaccine mandate and Mr. Shane's and members of the Religious Discrimination Class's religious beliefs, practices, or observances.

155.   Bio-Techne also violated the MHRA by its failure to reasonably accommodate Mr. Shane's and members of the Religious Discrimination Class's sincerely held religious beliefs, practices, or observances that conflicted with Bio-Techne's COVID vaccine mandate and that would not have created an undue hardship as defined in the MHRA.

156.   Bio-Techne engaged in religious discrimination and adverse employment actions against Mr. Shane and each member of the Religious Discrimination Class, without justification, at the explicit request of Bio-Techne's customers or based Bio-Techne's desire to please its customers that were biased against Mr. Shane and members of the Religious Discrimination Class because of their religious beliefs.

157.   Bio-Techne violated the MHRA, specifically Minn. Stat. § 363A.08, subd. 4, by requiring and requesting that Mr. Shane and members of the Religious Discrimination Class to furnish information pertaining to their religion and religious beliefs that was no necessary based on a request for evaluation of any request for religious accommodation or based on a bona fide occupational qualification.

158.   Bio-Techne engaged in religious discrimination against Mr. Shane and each member of the Religious Discrimination Class by designing unlawful policies and practices that were designed to intimidate and to deter employees from seeking religious accommodations related to COVID vaccination.

31

159.    Mr. Shane and members of the Religious Discrimination Class proposed accommodations that included measures that Bio-Techne knew were effective and useful in other circumstances—such as social distancing, testing, and mask wearing.

160.    No matter what accommodations a class member proposed, Bio-Techne did not respond and did not consider the proposal in an individualized way, but instead applied a one-size-fits-all rule rejecting exemption requests.

161.    Available reasonable accommodations would have allowed unvaccinated individuals, including Mr. Shane and each member of the Religious Discrimination Class, to safely work for Bio-Techne without any undue hardship to Bio-Techne's business.

162.    The only hardship to Bio-Techne's business related to Mr. Shane's or other members of the Religious Discrimination Class's unvaccinated status was self-inflicted and irrational choice by Bio-Techne to terminate the employee without cause. In so doing, Bio-Techne created a job opening that it knew would be difficult or in some cases, impossible, to fill.

163.    As a result, Bio-Techne fired, refused to hire, or otherwise took adverse employment action against each member of the Religious Discrimination Class.

164.    Had Bio-Techne interacted with Mr. Shane and the other Class members in good faith about their requests, it would quickly have realized that reasonable measures were available to accommodate class members' religious beliefs while imposing no burden or a *de minimis* burden on Bio-Techne.

165.    Specifically, Bio-Techne would have realized that employees could take a weekly COVID test, at their own expense, and maintain other basic mitigation practices—

and as a result would pose less transmission risk than vaccinated Bio-Techne employees who were not engaged in weekly testing.

166.    Bio-Techne failed to offer this reasonable accommodation to any class member, instead firing or refusing to hire each of them. Bio-Techne's actions constitute discrimination on the basis of religion and failure to accommodate, all in violation of the MHRA.

167.    Bio-Techne's actions constitute discrimination on the basis of religion and failure to accommodate, all in violation of the MHRA.

168.    Because of Bio-Techne's unlawful actions, Mr. Shane and each Class member have suffered and continue to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, treble damages, punitive damages, statutory penalties, and attorneys' fees in excess of $50,000.

## COUNT III
### Discrimination Based on Regarded as Disabled or Physically Impaired in Violation of the Americans with Disabilities Act
### (By the Perceived Disability Class)

169.    Mr. Shane and the Perceived Disability Class re-allege each of the foregoing paragraphs.

170.    Bio-Techne is an "employer" within the meaning of 42 U.S.C § 12111(5).

171.    Mr. Shane and the members of the Perceived Disability Class are and were "qualified individuals" within the meaning of 42 U.S.C. § 12111(8).

172.   The ADA prohibits discrimination on the basis of disability, 42 U.S.C. § 12112, which it defines to include "being regarded as having" an impairment of "a major life activity." 42 U.S.C. § 12102(1)(C).

173.   Safely meeting with or being near others indoors, standing, working, or being in close proximately with others, eating with others, engaging in common courtesies, and communicating in-person with others are major life activities under the ADA.

174.   The body's ability to infect others, the "functions of the immune system," and the risk posed by one's body or bodily systems to infect others with the COVID virus are major life activities under the ADA.

175.   Bio-Techne has asserted that it believed or perceived that Mr. Shane and other members of the Perceived Disability Class could not safely be indoors with other humans, could not safely work indoors with other humans, could not safely communicate or safely be with others in close proximity with others, and could not safely work in a Bio-Techne facility because of what Bio-Techne believed or perceived was an impairment to their body's systems, immune systems, and their body's unvaccinated status.

176.   Bio-Techne regarded Mr. Shane and Class members as being impaired in the functioning of their immune systems, and in the major life activities of meeting and interacting in person with other people.

177.   Bio-Techne's perception was false. Mr. Shane and class members could meet and interact in person with others as safely or more safely than other Bio-Techne employees with or without any accommodation.

178.    Bio-Techne discriminated against and undertook adverse employment actions against Mr. Shane and Class members based on their perceived disability by firing, refusing to hire, or otherwise taking adverse employment action against each class member.

179.    Bio-Techne's actions constitute discrimination on the basis of disability, all in violation of 42 U.S.C § 12112(a).

180.    Because of Bio-Techne's unlawful actions, Mr. Shane and each Class member have suffered and continue to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorneys' fees in excess of $50,000.

## COUNT IV
**Discrimination Based on Regarded Disabled or Physically Impaired in Violation of the MHRA
(By the Perceived Disability Class)**

181.    Mr. Shane and the Perceived Disability Class re-allege each of the foregoing paragraphs.

182.    Bio-Techne is an "employer" within the meaning of the MHRA.

183.    Mr. Shane and the members of the Perceived Disability Class are and were "qualified individuals" within the meaning of the MHRA.

184.    The MRHA prohibits discrimination on the basis of disability,  which it defines to include "regarded as having . . . an impairment," including "a physical, sensory, or mental impairment which materially limits one or more major life activities."

185.    Safely meeting with or being near others indoors, standing, working, or being in close proximately with others, eating with others, engaging in common courtesies, and communicating in-person with others are major life activities under the MHRA.

186.    The body's ability to infect others, the "functions of the immune system," and the risk posed by one's body or bodily systems to infect others with the COVID virus are major life activities under the MHRA.

187.    Bio-Techne has asserted that it believed or perceived that Mr. Shane and other members of the Perceived Disability Class could not safely be indoors with other humans, could not safely work indoors with other humans, could not safely communicate or safely be with others in close proximity with others, and could not safely work in a Bio-Techne facility because of what Bio-Techne believed or perceived was an impairment to their body's systems, immune systems, and their body's unvaccinated status.

188.    Bio-Techne regarded Mr. Shane and Class members as being impaired in the functioning of their immune systems, and in the major life activities of meeting and interacting in person with other people.

189.    Bio-Techne's perception was false. Mr. Shane and class members could meet and interact in person with others as safely or more safely than other Bio-Techne employees with or without any accommodation.

190.    Bio-Techne discriminated against and undertook adverse employment actions against Mr. Shane and Class members based on their perceived disability by firing, refusing to hire, or otherwise taking adverse employment action against each class member.

191.    Bio-Techne's actions constitute discrimination on the basis of disability, all in violation of the MHRA.

192.    Because of Bio-Techne's unlawful actions, Mr. Shane and each Class member have suffered and continue to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, treble damages, punitive damages, statutory penalties, and attorneys' fees in excess of $50,000.

**JURY DEMAND**

Mr. Shane and the Classes demand a trial by jury on all claims and issues for which they have a right to trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Shane and the Classes pray for judgment against Bio-Techne and that this Court:

A.    Adjudge, decree, and declare that Bio-Techne is liable to Mr. Shane and Class members for their actual damages in amounts to be proven at trial, including front pay, back pay, treble damages and statutory penalty, interest, emotional distress and pain and suffering, compensatory damages, punitive damages, and any damages or penalties available at law;

B.    Order and enjoin that Bio-Techne grant exemptions from COVID vaccination to all Class members, reinstate the employment status of any Class Member who requests it, and reconsider any pending job applications by Class members without attaching any negative weight to their COVID vaccination status;

C.  Award Mr. Shane and Class members their costs, damages, reasonable attorneys' fees, prejudgment interest, and any other relief permitted by statute; and

D.  Award such other or further relief as the Court may deem necessary, proper, just or equitable.

Dated: December 7, 2022                    **CROSSCASTLE PLLC**

By:    s/Samuel W. Diehl       
     Samuel W. Diehl (#388371)
     Nicholas J. Nelson (#391984)
333 Washington Avenue N.
Ste 300-9078
Minneapolis, MN 55401
P: (612) 429-8100
F: (612) 234-4766
Email:   sam.diehl@crosscastle.com
        nicholas.nelson@crosscastle.com

**ATTORNEYS FOR PLAINTIFF**

4895-6657-7959, v. 6